IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2016

**STATE OF TENNESSEE v. JOHNNY MALCOM VINSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2014-B-1571    Mark J. Fishburn, Judge**

**No. M2015-02420-CCA-R3-CD – Filed August 31, 2016**

The Defendant, Johnny Malcom Vinson, was convicted by a Davidson County Criminal Court jury of attempt to commit second degree murder, a Class B felony, two counts of aggravated assault, Class C felonies, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-210 (2014), 39-12-101 (2014), 39-13-102 (2014) (amended 2015); 39-17-1324 (2014). The trial court sentenced the Defendant to concurrent sentences of twenty-four years for attempted second degree murder, fifteen years for aggravated assault, and ten years for aggravated assault. The court also sentenced the Defendant to ten years for the firearm violation and ordered consecutive service, for an effective thirty-four-year sentence. The court further ordered the effective sentence in the present case to be served consecutively to a ten-year sentence in another case, for an overall effective forty-four-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Nicholas McGregor, Nashville, Tennessee, for the appellant, Johnny Malcom Vinson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glen Funk, District Attorney General; and Jan Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an incident between the Defendant and Angel Pack, the Defendant's then-wife, during which the victim suffered non-fatal gunshot wounds. At the

trial, Nojdar Shemssulldin testified that he worked as a cart attendant at Sam's Club on January 11, 2014, and that when he was collecting carts from the parking lot, he noticed a woman loading her car with items she had purchased. He said that the woman pointed to a car in the parking lot and that he thought a customer needed assistance loading items. Mr. Shemssulldin said that he approached the car, that he saw a man and a woman arguing, and that the man would not allow the woman to get inside the car. Mr. Shemssulldin said that the man pointed a gun at him and told Mr. Shemssulldin to back away. Mr. Shemssulldin said that he complied because he saw other customers in the parking lot and because he was scared when he saw the gun. He said that he saw the man strike the woman in the head with the gun and that he heard three or four gunshots. He said the man left in a maroon car. Mr. Shemssulldin said the victim was shot in the abdomen and hand. He called 9-1-1 and provided medical assistance. In the courtroom, Mr. Shemssulldin could not identify the man who shot the victim.

On cross-examination, Mr. Shemssulldin testified that he had been at work for a couple of hours at the time of the incident. He said that he saw the victim and the man arguing when he walked to the rear driver's side of the victim's car. Mr. Shemssulldin said that the victim was leaning against the car, that the man was "right . . . in front of her," that their chests were touching, that they were struggling, and that the man was holding the gun.

Metropolitan Police Detective Nathaniel Ellsworth testified that when he responded to the scene, the victim had been transported to the hospital. He said that four .40-caliber cartridge casings, the tip of the victim's finger, and a blood trail were found on the ground and that the victim's car had bullet holes. He obtained a recording from Sam's Club's parking lot surveillance camera, which was played for the jury.

Detective Ellsworth testified while viewing the surveillance recording that it was dated January 11, 2014, that the victim parked her white car in the parking lot at 1:21 p.m., that the victim left her car at 1:24 p.m., and that she walked inside the store. He said that the Defendant's maroon car arrived in the parking lot at 1:28 p.m., that the car parked behind the victim's car at 1:34 p.m., and that the car moved to the parking spot beside the victim's car at 1:39 p.m. Detective Ellsworth said that the victim returned to her car at 1:42 p.m., that the driver got out of the maroon car, that the victim placed the items she purchased inside her car, and that the driver of the maroon car returned to the maroon car. The detective said that the victim closed her trunk, returned the shopping cart, and walked toward her car; that the driver of the maroon car got out of the car; and that the victim and the driver of the maroon car stood between the victim's car and a silver car for several minutes. The detective said that the recording showed Mr. Shemssulldin walking toward the victim's car and backing away from the victim's car, the victim and the driver of the maroon car struggling, the victim's falling on the ground, and the driver of the maroon car driving away at 1:47 p.m.

Detective Ellsworth testified that based upon the information provided by the victim at the scene, the Defendant was identified as the driver of the maroon car and that the car was located at the Defendant's home, towed to the police department, and searched. The home was searched pursuant to a search warrant in the Defendant's absence. The detective took photographs of the victim's injuries at the hospital. The photographs showed bruises and abrasions to the victim's head, dried blood around the ear, and bandages on the right little and left index fingers. Detective Ellsworth said the tip of the victim's left index finger was missing.

The victim, the Defendant's former wife, testified that she and the Defendant had been married four or five years at the time of the incident and that she filed a complaint for divorce in November 2013. They were separated at the time of the incident. She said that in October 2013, she obtained an order of protection against the Defendant because he stalked her. The order of protection was received as an exhibit.

The victim testified that at the time of the incident, she knew where the Defendant lived and that Defendant drove a burgundy-colored Ford Taurus and a Chevy Silverado. She said that at the end of 2013 and at beginning of 2014, she worked for a hotel and an auction company. She said that every Saturday afternoon she went to Sam's Club to purchase groceries for the auction company, which had been her habit for about one year.

The victim testified that on January 11, she went Sam's Club, that she purchased groceries, and that the Defendant stood by her car when she returned to the parking lot. The victim identified the store's surveillance recording and stated that it showed her walking to her car with a cart of groceries. She said she began placing items inside her car while the Defendant stood beside her car. She said that the Defendant confronted her, that he wanted to talk, and that she told him she would call the police if he did not leave her alone. She said that the Defendant was nervous but appeared fine generally and that he walked away. She thought the Defendant was leaving and continued placing the groceries inside her car. She said that she returned the cart and began walking to her car, that the Defendant returned to her car with a gun, and that the Defendant told her to unlock her car door. She said the Defendant stated, "Unlock the f------ car because you're getting in the car and I am too and I'm killing both of us." She said that the Defendant was angry, that he began hitting her with the gun, and that he continued telling her to unlock the car. She told the Defendant she would not unlock the car. She said the Defendant broke her eyeglasses. She said that after the fourth strike, the Defendant said, "F--- it," cocked the hammer on the gun, and started shooting. She said the Defendant did not have the gun when she first saw him.

The victim testified that an employee from the store appeared, that the Defendant turned toward the employee, and that the Defendant told the employee that the employee would leave if the employee knew what was good for him. She said that the employee backed away and that she and the Defendant struggled for the gun as the Defendant fired it. She said that she suffered a gunshot wound to the abdomen, that a bullet took off the top of her index finger, and that a bullet grazed another finger. She said that the detached portion of the index finger was never reattached. She said she looked at the Defendant and said, "Johnny, what have you done?" She said that she closed her eyes because she thought the Defendant was going to shoot her again, that people came to her aid, and that the Defendant left.

The victim testified that she became scared when she first saw the Defendant, that she never thought the Defendant would come to the store, and that she was terrified when the Defendant went to his car and returned. She said that she suffered a lot of pain from the gunshot wounds, that she initially could not walk, and that she had a caretaker for one week.

On cross-examination, the victim testified that she saw the gun when the Defendant returned from his car and that she did not know which shots struck her. She said that after the Defendant shot her twice, he stood over her in position to continue shooting but that he left. She noted, though, people ran toward her car as the Defendant left. She said that before the shooting, she last spoke to the Defendant in October 2013.

Metropolitan Police Officer Douglas Belcher testified that he processed the crime scene. He identified photographs of the scene, which depicted Sam's Club's parking lot and evidence collected near the victim's car. Officer Belcher noted the victim's purple jacket, her broken eyeglasses, her cell phone, and five .40-caliber cartridge casings were recovered. He identified a photograph of suspected bullet defects on the driver's side of the victim's car.

Lawrence Gibbs testified that he owned the auction company at which the victim worked, that the Defendant frequented the auction house, and that the Defendant repaired Mr. Gibbs's lawnmowers. He said that the Defendant and the victim were his friends and that he was aware of the state of their marriage at the time of the shooting. Mr. Gibbs said that the Defendant came to the auction company on the day of the shooting because the Defendant wanted to talk to the victim about repairing their marriage. Mr. Gibbs said the Defendant drove his maroon Taurus.

Robert DeJaeger, the Defendant's landlord, testified that the Defendant had been a family friend since the 1990s. Mr. DeJaeger learned about the shooting from the evening news and said that he spoke to the Defendant the next morning and that Mr. DeJaeger visited the home the Defendant rented. Mr. DeJaeger said that the door was open when he arrived,

that he called the police to report a possible burglary, and that the police responded to the home and searched the home for the Defendant. Mr. DeJaeger testified that he spoke to the Defendant before the police arrived. Mr. DeJaeger said the Defendant stated that "he was on the run" and needed Mr. DeJaeger's assistance obtaining clothes and a bag from the Defendant's truck. Mr. DeJaeger said he told the Defendant to turn himself in to the police. Mr. DeJaeger said that after he spoke to the Defendant, Mr. DeJaeger received a telephone call from his brother, who said the Defendant had been apprehended at Mr. DeJaeger's parents' home.

Metropolitan Police Detective Joel Bontrager testified that when he and additional officers arrived at the Defendant's home with a search warrant, he saw the Defendant's truck parked outside. Detective Bontrager said that he saw items inside the truck that led him to believe the Defendant might attempt to flee the area and that a search warrant was obtained. He said a black bag containing clothes and a cell phone was found during the search.

Metropolitan Police Officer Cassandra Delbosco testified that she was dispatched to Mr. DeJaeger's parents' home and that someone had reported the Defendant was the Sam's Club shooter and was knocking on the door of an elderly woman. She said that officers looked around the property, that the Defendant was seen inside an SUV, and that the Defendant was apprehended without incident.

Upon this evidence, the Defendant was convicted of attempt to commit second degree murder, two counts of aggravated assault, and employing a firearm during the commission of a dangerous felony. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. Relative to the attempted second degree murder and aggravated assault convictions, he argues that the State failed to establish that he acted intentionally. We interpret the Defendant's argument as a claim that the evidence is insufficient because the victim's testimony was not "verified" by Mr. Shemssulldin's testimony and because the police did not find a gun. Alternatively, the Defendant asserts that the evidence is insufficient because the evidence shows he acted in a state of passion produced by adequate provocation and that the trial court should have instructed the jury on attempted voluntary manslaughter. Further, the Defendant argues his conviction for employing a firearm during the commission of a dangerous felony must be reversed because the evidence is insufficient to support his attempted second degree murder conviction. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Second degree murder is defined as a knowing killing of another. *Id.* § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2009) (amended 2011, 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

Assault is defined, in relevant part, as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2) (2014). A defendant commits aggravated assault when he "[i]ntentionally or knowingly commits an assault . . . and the assault . . .[i]nvolved the use or display of a deadly weapon[.]" *Id.* § 39-13-102(a)(1)(iii). A defendant also commits aggravated assault

> who, after being enjoined or restrained by an order . . . of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual . . . , intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against the individual . . . .

*Id*. § 39-13-102(c).

"It is an offense to employ a firearm during . . . [t]he commission of a dangerous felony. *Id*. § 39-13-1324(b)(1). Attempt to commit second degree murder is a dangerous felony. *See id*. § 39-13-1324(i)(1)(B).

Relative the attempt to commit second degree murder conviction, the evidence reflects, in the light most favorable to the State, that when the victim was inside Sam's Club purchasing groceries, the Defendant waited in the parking lot for the victim. At the time of the incident, the victim had obtained an order of protection against the Defendant, which was effective until May 27, 2014. Although the Defendant stated he wanted to talk to the victim in an apparent effort to reconcile their marriage, the victim told the Defendant she would call the police if he did not leave her alone. As the victim placed groceries inside her car, the Defendant walked to his car and returned with a gun. The victim testified that the Defendant stated, "Unlock the f------ car because you're getting in the car and I am too and I'm killing us both." The Defendant was angry and repeatedly struck the victim in the head with his gun. The victim said that after the fourth strike, the Defendant said, "F--- it," engaged the gun's hammer, and started shooting at her. The victim and the Defendant struggled, the Defendant shot the victim's hands and abdomen, and the victim asked the Defendant, "What have you done?" The victim testified that she closed her eyes because she thought the Defendant was going to shoot her again but that people in the parking lot approached, causing the Defendant to leave. Multiple .40-caliber cartridge casings were recovered from the parking lot where the incident occurred, and defects on the driver's side of the victim's car were consistent with bullets striking the car.

The Defendant argues that the victim's testimony needed to be "verified" by Mr. Shemssulldin's testimony. The jury heard the victim's testimony and was permitted to determine her credibility and to weigh her testimony as the jury deemed appropriate. We conclude that the victim's testimony alone is sufficient evidence to support the attempted second degree murder conviction. The Defendant told the victim to unlock her car because he was going to kill her and then kill himself after they got inside her car. When the victim refused to unlock the door, the Defendant began firing the gun at the victim. Likewise, the Defendant's saying, "F--- it," just before shooting the victim and the Defendant's shooting the victim's hands and abdomen shows that the Defendant acted with an awareness that his conduct was reasonably certain to cause the victim's death, although she survived. The evidence is sufficient to support the Defendant's attempted second degree murder conviction.

In any event, we note Mr. Shemssulldin testified that as he approached the victim's car, he saw a man and a woman argue and the man prevent the woman from entering her car. Mr. Shemssulldin saw the man strike the woman in the head with the gun and heard gunshots. Mr. Shemssulldin said the man left in his maroon car, which was identified as the Defendant's car. We note the surveillance recording from the parking lot corroborated the testimony. The evidence is sufficient to support the Defendant's attempted second degree murder conviction, and he is not entitled to relief on this basis. Furthermore, because the evidence is sufficient to support the Defendant's attempted second degree murder conviction and because he used a firearm to commit the offense, the evidence is likewise sufficient to support his employing a firearm during the commission of a dangerous felony conviction. *See* T.C.A. § 39-17-1324(i)(1)(B).

Furthermore, we reject the Defendant's argument that the evidence reflects the Defendant acted based upon a state of passion produced by adequate provocation. In the light most favorable to the State, the Defendant was prohibited by the order of protection from having contact with the victim, and the Defendant, knowing the victim's routine, sought the victim and waited for the victim outside Sam's Club. Upon seeing the Defendant, the victim attempted to load her groceries and leave. When the victim told the Defendant she would call the police if he did not leave her alone, the Defendant walked to his car, retrieved a gun, and began striking her with the gun before shooting her twice. No evidence shows the Defendant acted based upon a state of passion produced by adequate provocation. In any event, the evidence established the Defendant's guilt of attempted second degree murder beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

Relative to the aggravated assault against the victim, the record reflects that the victim filed for divorce in November 2013, that the divorce proceedings were pending at the time of the shooting, and that in October 2013, she sought an order of protection because of the Defendant's stalking her. The November 27, 2013 order of protection reflects that the court found the Defendant abused or threatened to abuse the victim. The court ordered the Defendant to have no contact with the victim for any purpose and to stay away from the victim's home. Although the Defendant was permitted to go to the auction company where the victim was employed, he was prohibited from approaching the victim in the concession area where the victim worked. The order was effective through May 27, 2014.

As a result, the Defendant was enjoined or restrained by a court order from having contact with the victim. Likewise, the Defendant's conduct during the incident shows he intentionally or knowingly caused the victim bodily injury by striking her head repeatedly with a gun and shooting her fingers and abdomen. The evidence is sufficient to support the conviction, and the Defendant is not entitled to relief on this basis.

Relative to the aggravated assault against Mr. Shemssulldin, the record reflects that as Mr. Shemssulldin approached the victim's car in the parking lot, he saw a man and a woman arguing and saw the man's preventing the woman from getting inside her car. Mr. Shemssulldin said that when the man saw Mr. Shemssulldin, the man pointed the gun at Mr. Shemssulldin and told Mr. Shemssulldin to back away. The victim provided similar testimony, and the recording showed Mr. Shemssulldin walking toward the victim's car and backing away from the victim's car. Mr. Shemssulldin said he complied because he saw other customers in the parking lot and because he was scared when he saw the gun. The evidence is sufficient for a reasonable jury to have concluded beyond a reasonable doubt that the Defendant intentionally or knowingly caused Mr. Shemssulldin to reasonably fear imminent bodily injury by pointing a gun at Mr. Shemssulldin and threatening him. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions.

_____
ROBERT H. MONTGOMERY, JR., JUDGE